United States District Court
Southern District of Texas
FILED

APR 0 2 2001

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Respondent, | § | |
| | § | |
| vs. | § | C.R. NO. B-96-251 |
| | § | |
| ERNESTO URIBE-DELEON, | § | |
| Petitioner. | § | |
| (C.A. NO. B-01-27) | § | |

RESPONSE TO MOTION FOR RELIEF
UNDER 28 U.S.C. § 2255 AND MOTION TO DISMISS

TO THE HONORABLE JUDGE OF SAID COURT:

The UNITED STATES OF AMERICA ("the government") files this response and motion to dismiss Ernesto Uribe-DeLeon's ("Uribe-DeLeon's") Motion For Relief Under 28 U.S.C. § 2255. In support thereof, the government would show the court the following:

I.

JURISDICTION

A.    Course of proceedings and disposition below.

On September 10, 1996, the Grand Jury for the United States District Court for the Southern District of Texas, Brownsville Division, filed an indictment, Criminal Case No. 96-251, in which it charged Uribe-DeLeon, Armando DeLeon Uribe, Antonio Trevino, and Nelson Read with violations of 21 U.S.C. §§ 846 and 841(a)(1), that is, conspiracy to possess with intent to distribute more than 100 kilograms of marijuana (count 1) and possession with intent to distribute marijuana (counts 2-4) (DOC 1). On September 10, 1996, the United States Magistrate Judge (Garza, J.) issued an Order For Issuance of Bench Warrant and Setting Amount of Bail (DOC 2). On September 17,

1998, Uribe-DeLeon was arrested at 1234 La Posada, Brownsville, Texas . On September 23, 1998, Uribe-DeLeon entered a plea of not guilty (DOC 59).

On October 16, 1998, Uribe-DeLeon filed a Motion To Dismiss Indictment For Violation of Defendant's Right to a Speedy Trial. This motion was grounded on the premise that the government failed to exercise due diligence in apprehending Uribe-DeLeon after the indictment was returned (DOC 68). On November 5, 1998, the district court (Vela, J.) conducted a hearing on the merits of Uribe-DeLeon's motion to dismiss the indictment. At the close of the hearing, the court denied the motion to dismiss (DOC 72). The court filed a written order on December 3, 1998 (DOC 78).

After his motion was denied, Uribe-DeLeon entered a plea of guilty on count 4 of the indictment reserving his right to appeal from the district court's denial of his motion to dismiss (DOC 74). The district court accepted Uribe-DeLeon's plea, found him guilty, ordered the preparation of a presentence investigation report (PSR) and set the case for sentencing (DOC 76).

Uribe-DeLeon's sentence was imposed on January 13, 1998: The district court remanded Uribe-DeLeon into the custody of the Bureau of Prisons to serve a 77-month term of imprisonment that was to be followed by a five-year term of supervised release (DOC 93).

Uribe-DeLeon perfected an appeal to the United States Court of Appeals for the Fifth Circuit. On March 23, 2000, the court of appeals issued an unpublished, summary opinion affirming the judgement of conviction.

On February 7, 2001, Uribe-DeLeon with the assistance of an "inmate legal advocate" by the name of Roy Dixon timely filed a motion for relief under 28 U.S.C. § 2255. Jurisdiction is thus vested in this court under 28 U.S.C. § 2255.

2

B.    Statement of facts.

The district court opened the hearing on Uribe-DeLeon's motion to dismiss the indictment by noting the two dates that affected its analysis: the date the indictment was filed, September 10, 1996; and the date of Uribe-DeLeon's arrest, September 17, 1998 (DOC 112, p. 6). The government then elicited the testimony of United States Customs Service (Customs) Special Agent Ernesto Espindola.

In 1996, Ernesto Espindola was the agent-in-charge of the Brownsville office of the United States Customs Service (DOC 112, p. 7). Special Agent Espindola recalled the case against Uribe-DeLeon went before the grand jury in 1996 and Uribe-DeLeon was indicted together with his brother Armando Uribe, Nelson Read, and Antonio Trevino (DOC 112, p. 8). After the indictment was filed, Espindola attempted to locate Uribe-DeLeon. He related that he went to Uribe-DeLeon's residence, 1234 La Posada, Brownsville, Texas, and managed to talk to a woman whom Espindola believed to be the maid. He advised this woman that he had a warrant authorizing Uribe-DeLeon's arrest (DOC 112, p. 9).

Special Agent Espindola related that, around the time the indictment was filed, he was informed that Uribe-DeLeon was in Mexico working on property that he owned . Espindola decided to wait until he returned. On September 16, 1996, Armando Uribe-DeLeon was arrested (DOC 112 p. 10). Shortly after Armando's arrest, on October 31, 1996, Espindola testified during a hearing on Armando's motion to suppress. Present among the spectators to this hearing were several members of Uribe-DeLeon's family including one sister and one brother. Ernesto Uribe-DeLeon's role in the offense was brought out during that hearing (DOC 112, p. 11).

On November 1, 1996, Armando Uribe-DeLeon failed to appear for jury selection. In an effort locate him, Special Agent Espindola contacted Armando's sister-in-law, Alma Garcia. Garcia was employed by the United States Customs Service at the Gateway Bridge (DOC 112, p. 12).

After Armando's disappearance, Espindola related that he continued to try to reach Ernesto at his home. When Ernesto changed his telephone number, Espindola reported that he secured the new one from Uribe-DeLeon's mother. He called the new number and talked to a woman he believed to be Uribe-DeLeon's wife. He identified himself and told her he was still looking for Ernesto (DOC 112, p. 13).

Uribe-DeLeon also managed to elude the periodic surveillance Special Agent Espindola established on 1234 La Posada (DOC 112, p. 14). In addition, Espindola placed Uribe-DeLeon's name in the TECS system: a computerized listing of names of individuals maintained by the Treasury Department who are subject to legal process (DOC 112, p. 15). Ultimately, Armando Uribe-DeLeon turned himself in sometime in April of 1998 (DOC 112, p. 16). According to Espindola, while he remained at large, Armando had apparently been working with Ernesto in Mexico (DOC 112, p. 17).

On cross, Espindola confessed that he had not asked the name of the lady who had responded to his call to Uribe-DeLeon's father (DOC 112, p. 18). He explained that he was trying to discover the new telephone number and did not want to spook the woman by telling her who he was (DOC 112, p. 19). After he received the new telephone number, he called Uribe-DeLeon's residence. This time he identified himself and declared that he was still trying to find Ernesto. He believed this call was made in April or May of 1997 (DOC 112, p. 21). The woman who received the call simply said that Ernesto was not there (DOC 112, p. 23).

4

Through April of 1998, Special Agent Espindola estimated that he set up surveillance on Uribe-DeLeon's residence between eight and ten times (DOC 112, p. 25). On cross, Espindola related that he had heard that Uribe-DeLeon and his wife operated a couple of snow cone stands in Brownsville. He confessed that, during the pendency of the indictment, no one from his agency had made any effort to locate and approach these stands (DOC 112, p. 27).

Customs Special Agent Danny Ibarra inherited the case against Uribe-DeLeon in July of 1998 after Special Agent Espindola was promoted and transferred to Houston (DOC 112, p. 32). Special Agent Ibarra re-checked the addresses he had been given by Espindola and set up surveillance on 1234 La Posada himself. He related that he observed the premises at different times on various days (DOC 112, p. 33). In addition, he placed his name in the TECS system so that he would be contacted in the event something turned up. He also placed lookouts on the vehicles he had observed in the vicinity of Uribe-DeLeon's residence (DOC 112, p. 34).

The latter effort did lead to several inconsequential results. Ibarra recalled that he received several notices from the system touching on the crossing of a Ford Explorer registered in the name of Uribe-DeLeon's wife. When Uribe-DeLeon was not found in the vehicle at the checkpoint, it was released (DOC 112, p. 35).

In the end, the apprehension of Ernesto Uribe-DeLeon owed more to serendipity than investigative wizardry: a Customs agent from McAllen walked into an automotive shop in Brownsville to purchase some parts for his car when he saw and recognized Uribe-DeLeon (DOC 112, p. 37). The itinerant agent from McAllen immediately called the Brownsville office. Several agents were dispatched to 1234 La Posada where they encountered and arrested Ernesto Uribe-DeLeon (DOC 112, p. 38).

5

During his handling of the investigation, Special Agent Ibarra asserted he never saw any males, save for a young man who was evidently not Ernesto Uribe-DeLeon, in the vicinity of 1234 La Posada during the roughly ten times that he conducted surveillance on the premises (DOC 112, p. 39). Like his predecessor, Ibarra did not check out the snow cone locations (DOC 112, p. 41).

Uribe-DeLeon's wife, Nereyda Villanueva De Uribe, had been married to DeLeon-Uribe for almost 21 years and related they had resided at 1234 La Posada for roughly 17 years (DOC 112 , p.. 43). Mrs. Uribe declared that her husband had been living and sleeping at 1234 La Posada continuously from the date the indictment was returned until he was arrested (DOC 112, p. 44). She related that she and her husband operated three small snow cone  stands - Uribe-DeLeon was responsible for the ice and the fruit among other tasks. She testified that no official had formally came to her house seeking her husband (DOC 112 ,. p. 45). Although she knew Armando was having a problem with the authorities, she professed ignorance with respect to her husband's situation. She testified that her husband's family did not contact her during the pendency of the indictment (DOC 112, p. 45).

Mrs. Uribe did testify that Uribe-DeLeon worked on property owned by his grandmother in Mexico, but never lived there nor did he stay there (DOC 112, p. 47). She declared that she could not recall ever having talked to a Customs agent at her house. She testified that all of their bills were addressed to 1234 La Posada under her husband's name (DOC 112, pp.48-49).

On cross-examination, she recalled that an officer at the International Bridge asked her about her husband while she was on her way back to Brownsville from Matamoros, Republic of Mexico. She told them that her husband was at home. According to Mrs. Uribe, the officers did not tell her why they were looking for Ernesto, nevertheless, she told Ernesto that an officer had asked after him

6

(DOC 112, p.. 51). Upon receiving this information, Ernesto neither turned himself in nor did he ask why Customs officials at the International Bridge were asking for him by name (DOC 112, p. 52).

Mrs. Uribe confessed that she knew that her brother-in-law had been arrested in September of 1996 (DOC 112, p. 52), but declared that she did not know that he had failed to appear for trial in November 1996 (DOC 112, p. 52-53). She related that neither she nor her husband changed their telephone number between 1996 and 1997 (DOC 112, p. 53). According to Mrs. Uribe, her husband was not especially close to his brother, Armando. She explained that Ernesto was the oldest while Armando was the youngest, consequently they had little in common, save for their parents, and did not communicate much (DOC 112, p. 55). As a result of this familial distance, Mrs. Uribe testified that she never knew that her brother-in-law was in trouble for marijuana-trafficking and that her husband had been identified as a party to that venture (DOC 112, pp. 54-55). Moreover, Mrs. Uribe claimed that her sister, Alma Garcia, a Customs Service employee did not tell her that her husband was the subject of an arrest warrant (DOC 112, p. 59).

Ernesto Uribe, Sr. could not recall anyone from the government calling him and asking for his son (DOC 112, p. 61). Just like Mrs. Uribe-DeLeon, the senior Uribe declared that he did not know that his son had been indicted. Although Mr. Uribe was present during Armando's suppression hearing when Ernesto's involvement in the offense became a matter of record, he claimed that no one had revealed this to him (DOC 112, pp. 62-63). Indeed, Mr. Uribe testified that he was not aware of the fact that Armando had fled. He also testified that he had seen his son, Uribe-DeLeon, at his house many times between 1996 and 1998 (DOC 112, p. 63). Mr. Uribe related that his son actually worked on his house during that time. He never tried to hide the fact that he was

7

there. Indeed, such concealment would have proved difficult since Uribe-DeLeon was working on his father's roof (DOC 112, pp 64-65).

Mr. Uribe admitted that a portion of the $10,000 declared forfeit when Armando absconded was his. Initially, he could not recall the fact that his mother owned some land in Mexico until the prosecutor noted that Ernesto worked that property for her (DOC 112, p. 66). Like his daughter-in-law, Mr. Uribe claimed he did not know that his sons were involved in the same offense (DOC 112, p. 67).

Uribe-DeLeon's son, Ernesto, Jr., testified that his father was at home at 1234 La Posada, Brownsville, Texas, between September 1996 and September 1998 (DOC 112, p. 70). He declared that his father did nothing during this time that was consistent with someone trying to avoid official service. Indeed, he even put a new roof on his house (DOC 112, p. 71). He claimed that his father worked with him selling snow cones at the 77 Flea Market on weekends and occasionally went over to Mexico to work on his great-grandmother's land (DOC 112, p. 72-73).

According to the younger Uribe, no one from the government had come to their house looking for his father (DOC 112, p. 73). Moreover, he asserted that the family had not received anything in the mail indicating that his father was charged with a violation of federal criminal law (DOC 112, p. 74).

After the junior Uribe-DeLeon described what his father grew in Mexico, the district judge declared that he understood the thrust of the testimony and opined that it did not look like "the Government is going to be able to prove that they made an all out, deliberate, good law enforcement effort to find the defendant, but I don't think that's the contingency that is going to determine the case" (DOC 112, p. 75). Although the government's efforts to apprehend Uribe-DeLeon were

8

feeble, the court continued, it did not find this lack of effort to be "intentional". The court characterized the government's lackluster effort as "negligent", but not grossly negligent (DOC 112, p. 76). The court weighed this factor in favor of Uribe-DeLeon (DOC 112, p. 77). Thereafter, the district judge disagreed with Uribe-DeLeon's assertion that the delay was "extraordinary" and entered the following findings:

> One I have already stated of record, that is the fact that I do not find that the Government exhaustively engaged in all the necessary pursuits to discover the whereabouts of the defendant. However, I do acknowledge that there was an effort made and that it was not an intentional doing on their part not to find the defendant. I have no reason to believe that - - I don't go that far.

> So I am going to assess at the very most negligence on their part during the course of the period that elapsed between the time the defendant was indicted to the time that he was arrested.

> However, I am not going to make a finding that the delay in this case was uncommonly long because I don't so find. I don't so find.

> I am going to find that the defendant did assert his right to speedy trial after he was arrested. I have no knowledge that he knew that he had been indicted or the like, for that issue is not before me. He timely objected after his arrest. But I have no idea whether that would play - - that particular inquiry would play a role in view of the fact that what he is contending that he didn't know that he was indicted. - -

> So that's a strike that I think will be in his favor in view of what he is contending. But in fairness to him, he did raise the issue as soon as he was brought to court.

> Now, as would regard the other inquiry, did he suffer any prejudice? I have no evidence, none whatsoever, that he has in any way, manner, fashion, or form been prejudiced because of the two-year delay.

> And, accordingly, his motion to dismiss on the grounds of a violation of Speedy Trial protection is denied.

(DOC 112, p. 77-79).

9

After the district court denied his motion to dismiss the indictment, Uribe-DeLeon announced his intent to enter a plea of guilty conditioned on his right to appeal the denial of the motion to dismiss (DOC 112, p. 79). Thereafter, the district court placed Uribe-DeLeon under oath, engaged him in the colloquy mandated by Rule 11 of the Federal Rules of Criminal Procedure (DOC 112, pp. 81-91), and elicited the following factual basis for the plea:

> Your Honor, the facts in this case would show that on or about February 3rd of 1994 this defendant, Ernesto Uribe-DeLeon, asked the confidential source for U.S. Customs to transport a load of marijuana from Brownsville, Texas, to Houston, Texas. The source agreed to do so after consulting with Customs.
>
> On or about February 4th of 1994 Mr. Uribe actually delivered 151 kilograms of marijuana to the source with instructions to deliver it to Houston, Texas. The marijuana was subsequently turned over to U.S. Customs.

(DOC 112, p. 91). After Uribe-DeLeon acknowledged the verity of the government's summary, the district court accepted his plea, found him guilty, ordered the preparation of a presentence investigation report (PSR) and set the case for sentencing (DOC 112, p. 92).

Uribe-DeLeon challenged the propriety of the district court's ruling on his motion to dismiss the indictment on appeal. In a summary opinion, attached hereto as Appendix A, the court of appeals affirmed.

## II.

## GROUNDS FOR RELIEF

In his motion for relief under 28 U.S.C. § 2255, Uribe-DeLeon and his intrepid inmate legal advocate advance two grounds for relief[1]: (1) Whether the two-year delay between indictment and

---

[1]Inmate Legal Advocate Roy Dixon does not fully identify himself in the pleading. From the style and tenor of the motion, the government has reason to believe that Mr. Dixon acquired his advocacy skills by advancing his own defense in Criminal Case No. G-94-9 after which he was awarded Reg. No. 66303-079.

arrest deprived Uribe-DeLeon of his right to due process of law; and (2) whether Uribe-DeLeon was denied his right to the effective assistance of counsel at sentencing and on appeal by virtue of counsel's failure to object to the district court's finding with respect to his role in the offense and his failure to secure a sentencing departure grounded on the theory that Uribe-DeLeon's criminal history score did not adequately represent the seriousness of his past criminal conduct.

III.

## RESPONSE AND MOTION TO DISMISS

A.    Due process and post-indictment delay in prosecution

In his first ground for relief, Uribe-DeLeon advances the proposition that his sentence should be set aside and the indictment dismissed as a result of the prejudice he reportedly suffered as a result of the two-year delay between indictment, arrest, and trial. Uribe-DeLeon raised this issue before trial and before he entered his conditional plea of guilty.   It was raised again on direct appeal in accordance with his conditional plea. On appeal, the court of appeals summarily held, "Our review of the record and the briefs on appeal reveals that the district court did not err in its conclusion that Uribe-DeLeon's Sixth Amendment right to a speedy trial was not infringed." *See Attachment A.* Since this issue was resolved on direct appeal, it is not subject to review in a Section 2255 hearing. *United States v. Kalish*, 780 F.2d 506, 508 (5th Cir.), *cert. denied*, 476 U.S. 1118, 106 S.Ct. 1977 (1986), citing *United States v. Jones*, 614 F.2d 80, 82 (5th Cir. 1980).

The law of the case doctrine is the rule under which the trial court and the appellate courts are bound by any findings of fact or conclusions of law made by the appellate court in a prior appeal of the case at issue. *United States v. Burns*, 662 F.2d 1378, 1384 (11th Cir. 1981). The Fifth Circuit outlined the scope of the law of the case doctrine in *United States v. 8.41 Acres of Land*, 783 F.2d

11

1256 (5th Cir.), *cert. denied*, 479 U.S. 820, 107 S.Ct. 85 (1986):

> The doctrine of the law of the case forecloses a different result from that which was obtained in the earlier of two appeals. A decision of a legal issue by an appellate court establishes the law of the case which must be followed in all subsequent proceedings in the same case whether those proceedings take place at the trial court or in the appellate court, unless one of the following three exceptions is met: (1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to such issue, or (3) the prior decision was clearly erroneous and would work manifest injustice. *EEOC v. International Longshoreman's Association*, 623 F.2d 1054, 1058 (5th Cir. 1980), *cert. denied*, 451 U.S. 917, 101 S.Ct. 1997 (1981). *See, e.g., Chapman v. National Aeronautics and Space Administration*, 736 F.2d 238, 241 (5th Cir.), *cert. denied*, _ U.S. _, 105 S.Ct. 517 (1984); *United States v. 162.20 Acres of Land*, 733 F.2d 377, 379 (5th Cir. 1984), *cert. denied*, _ U.S. _, 105 S.Ct. 906 (1985). The doctrine does not reach questions which were not decided in a former proceeding, but it does cover those issues decided by necessary implication as well as those decided explicitly. *International Longshoreman's Assoc.*, 623 F.2d at 1058. *Chapman*, 736 F.2d at 241.

*United States v. 8.41 Acres of Land*, 783 F.2d at 1259. Save for characterizing the alleged violation as one of due process arising under the Fifth Amendment, Uribe-DeLeon offers nothing to except the instant controversy from the law of the case doctrine. Moreover, simply by characterizing the alleged deprivation as one of "due process" does not make it so, especially since the analysis Uribe-DeLeon advances to support his contention invokes the same Sixth Amendment speedy trial principles that were applied when the district court denied the motion to dismiss and the court of appeals applied when it affirmed that denial. In sum, relief should be denied on Uribe-DeLeon's first complaint because it has already been resolved against him by the court of appeals.

B.   Ineffective assistance of counsel at sentencing and on appeal

Uribe-DeLeon contends that his right to the effective assistance of counsel was abrogated by the attorney who represented him when his sentence was imposed and by his appellate counsel who failed to raise any sentencing issues. To fathom why these contentions are without merit, the court

12

must first revisit the recommendations of the pre-sentence investigation report (PSR).

In summarizing the offense conduct, the probation officer observes that the United States Customs Service learned that Uribe-DeLeon, an individual who was reported to have been involved in large-scale marijuana trafficking, had been contacted by members of a Guadalajara-based smuggling organization known as the "Reyes Organization" (PSR ¶ 14). During an interview with Customs investigators, Uribe-DeLeon denied any knowledge of imminent drug smuggling.

On March 3, 1992, a confidential informant (ci) advised Customs agents that Uribe-DeLeon was in the market for a truck driver who could transport marijuana to Houston (PSR ¶ 15). On March 9, 1992, Uribe-DeLeon was reported to have access to about 250 pounds of marijuana that was bound for Houston (PSR ¶ 17). On the twelfth, Uribe-DeLeon was alleged to have been in the process of purchasing a tractor-trailer to be used to transport contraband to Houston (PSR ¶ 18). By March 24, 1992, word on the street was that Uribe-DeLeon was readying about 500 pounds of marijuana for shipment to Houston (PSR ¶ 19).

On October 19, 1992, the ci alerted Customs agents to the fact that Uribe-DeLeon was storing about 500 pounds of marijuana in Brownsville (PSR ¶ 23). On February 3, 1994, Uribe-DeLeon reportedly invited the ci to transport 300 pounds of marijuana. Uribe-DeLeon advised the ci that there would be about 600 pounds of marijuana involved in the complete transaction (PSR ¶ 25). One day later the agents seized about 151 kilograms of marijuana (PSR ¶ 26). In connection with that seizure, Uribe-DeLeon paid the ci $4,000 for transporting this load (PSR ¶ 27). From this series of transactions, the probation officer advanced the following recommendation:

> It appears that the defendant Ernesto Uribe-DeLeon had a more culpable role in this instant offense in that he was in charge of the marijuana, making arrangements for the transportation and paying the driver. Although the evidence does not reflect that

> he was the owner of the marijuana, it appears he was the middle man, does (sic) having a higher role in the offense than the other co-defendants.

(PSR ¶ 28).  Uribe-DeLeon acknowledged his role in the offense (PSR ¶ 34).  The probation officer recommended a base offense level of 26 (PSR ¶ 37), to which two levels were added under the authority of USSG § 3B1.1 (PSR ¶¶ 40, 41), and three levels were deducted for acceptance of responsibility, USSG § 3E1.1 (PSR 44).  Uribe-DeLeon's total offense level was 25 (PSR ¶ 44). Uribe-DeLeon's criminal record netted him four criminal history points placing him in criminal history category III (PSR ¶ ¶ 55, 56).  The applicable guideline imprisonment range was 70 to 87 months (PSR ¶ 80).

The district court adopted the recommendations of the PSR and imposed a sentence based on a total offense level of 25 and criminal history category III..  The court remanded Uribe-DeLeon into the custody of the Bureau of Prisons to serve a 77-month term of imprisonment.

To secure relief under a complaint for ineffective assistance of counsel, a § 2255 petitioner must show (1) counsel's performance was deficient and (2) prejudice.  A criminal defendant alleging prejudice must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Lockhart v. Fretwell*, _ U.S. _, 113 S.Ct. 838, 842 (1993)(quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984)).  In *Fretwell*, the Court observed:

> [An] analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective.  To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him.

_ U.S. _, 113 S.Ct. at 842-43.  The "prejudice" prong of the *Strickland* test focuses on the question

14

of whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. "Unreliability or unfairness does not result if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him." *Id.* _ U.S. _, 113 S.Ct. at 844. *Goodwin v. Johnson*, 132 F.3d 162, 170 (5th Cir. 1997).

The burden falls on the accused to prove a violation of constitutional standards. The focus is on the attorney's impact on the adversarial process; the constitutional standards may be met irrespective of an accused's evaluation. *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039 (1984).

The Supreme Court has recently held that the proper standard for evaluating claims of ineffective assistance of counsel on appeal is the *Strickland* standard. *Smith v. Robbins*, _ U.S. _, 120 S.Ct. 746, 764 (2000). In passing on the prejudice prong of the analysis, the Court observed:

> In *Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308 (1983), we held that appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal. Notwithstanding *Barnes,* it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent.

120 S.Ct. at 765.

In *United States v. Williamson*, 183 F.3d 458 (5th Cir. 1999), the United States Court of Appeals for the Fifth Circuit encountered a case in which counsel proved to be ineffective on direct appeal. The *Williamson* court noted that the Fifth Circuit assessed the effectiveness of appellate counsel under the *Strickland* standard. 183 F.3d at 462. The court observed that "a reasonable attorney has an obligation to research relevant facts and law or make an informed decision that certain avenues will not prove fruitful... Solid meritorious arguments based on direct controlling

15

precedent should be discovered and brought to the court's attention." 183 F.3d at 462-463. The court concluded that Williamson's attorney did not provide "objectively reasonable assistance" when counsel failed to discover a precedent clearly applicable to Williamson's case. 183 F.3d at 463. The court further held that counsel's deficient performance adversely affected Williamson's substantial rights at sentencing. *Id*. at 464.

In *Glover v. United States*, _ U.S. _, 121 S.Ct. 696 (2001), the Court held that any increase in a sentence stemming from an error that would have been correctable on appeal establishes the prejudice prong of *Strickland*. _ U.S. at _, 121 S.Ct. at 700-01. The Court remanded the case for an assessment of the reasonableness of counsel's performance.

The sole issue in the instant controversy is whether Uribe-DeLeon's trial counsel reasonably decided not to pursue an objection to the recommendation that Uribe-DeLeon's offense level be adjusted for his role in the offense. Viewing the issue from counsel's perspective at the time of sentencing, it is clear from the provisions of the PSR that the two level adjustment was justified. Uribe-DeLeon exercised some decision making authority with respect to when loads would be shipped from Brownsville; he recruited drivers; stored contraband and expected a large portion of the proceeds than the average participant; and the activity was extensive. USSG § 3B1.1(c), comment. n. 4. If counsel had elected to object to the proposed adjustment, he risked the three level reduction for acceptance of responsibility - he would, in effect, have been objecting to the conduct for which Uribe-DeLeon was found guilty.

Uribe-DeLeon advances nothing to justify a finding that his criminal history score overstated the seriousness of his criminal record.. Indeed, if anything, the score is understated (see PSR ¶¶ 51-54). Since counsel could offer nothing to justify a discretionary downward departure, his decision

16

not to pursue that improbable objective cannot be deemed unreasonable. Since counsel's sentencing decisions were reasonable when made, Uribe-DeLeon cannot make out a claim that his Sixth Amendment right to counsel was abrogated at sentencing.

Uribe-DeLeon's complaint that his appellate attorney was ineffective by failing to raise sentence issues on appeal is also unavailing. The sentencing issues were not preserved. In any event the sentencing determinations Uribe-DeLeon and his inmate legal assistant would have counsel challenge are subject to the clearly erroneous and abuse of discretion standards of review. Recently, the Supreme Court has held that a reviewing court must not only accept the sentencing court's findings of fact unless clearly erroneous, but must also "give due deference to the district court's application of the guidelines to the facts ." *Buford v. United States*, _ U.S. _, _ S.Ct. _, 2001 WL 265345 * 4 (2001); 18 U.S.C. § 3742(e).  Since the facts were not contested at the time of sentencing, appellate counsel's decision to focus on the speedy trial issue alone cannot be deemed unreasonable.  Uribe-DeLeon was not denied the effective assistance of counsel on appeal.

C.    Need for and evidentiary hearing and conclusion

A Section 2255 Motion requires a hearing unless the files, the motion, and the record of the case conclusively show that no relief is appropriate.  28 U.S.C. § 2255 (foll.), Rule 8(a).  *United States v. Santora*, 711 F.2d 41 (5th Cir. 1983).  The need for an evidentiary hearing depends upon an assessment of the record.  If the district court cannot resolve the allegations without examining evidence beyond the record, it must hold a hearing.  If the record is adequate to fairly dispose of the allegations, the court need inquire no further.  *United States v. Smith*, 915 F.2d 959, 964 (5th Cir. 1990).

CNNPDF - www.texto.com

Although the allegations of a *pro se* complaint are held to a less stringent standard than the formal pleading drafted by lawyers, if it appears beyond doubt that the plaintiff can plead no set of facts that would entitle him to relief, the cause will be dismissed. *Haines v. Kerner*, 404 U.S. 519, 92 S.Ct. 594 (1972). The instant cause does not merit a hearing.

The government prays that the court enter an order dismissing Uribe-DeLeon's motion for section 2255 relief.

Respectfully submitted,

MERVYN M. MOSBACKER
United States Attorney

By: _____

JAMES L. TURNER
Assistant United States Attorney
Federal Bar #: 1406
State Bar #: 2031695
910 Travis #1500
Houston, Texas 77208
(713) 567-9361

18

Case 1:01-cv-00027   Document 3   Filed in TXSD on 04/02/2001   Page 19 of 21

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

U.S. COURT OF APPEALS
**FILED**

No. 99-40136
Summary Calendar

MAR 2 3 2000

CHARLES R. FULBRUGE III
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ERNESTO URIBE-DELEON,

Defendant-Appellant.

--------------------

Appeal from the United States District Court
for the Southern District of Texas
USDC No. B-96-CR-251-1

--------------------

March 23, 2000

Before REAVLEY, BARKSDALE and STEWART, Circuit Judges.

PER CURIAM:[*]

Ernesto Uribe-DeLeon appeals his conditional guilty-plea

conviction for possession with the intent to distribute

marijuana.  He argues that his Sixth Amendment right to a speedy

trial was infringed by the 24-month delay between his indictment

and his arrest.  Our review of the record and the briefs on

appeal reveals that the district court did not err in its

conclusion that Uribe-DeLeon's Sixth Amendment right to a speedy

---

[*]  Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 99-40136
-2-

trial was not infringed.  See Robinson v. Whitley, 2 F.3d 562,
568-71 (5th Cir. 1993).  The judgment of the district court is
AFFIRMED.

Case 1:01-cv-00027   Document 3   Filed in TXSD on 04/02/2001   Page 20 of 21

## CERTIFICATE OF SERVICE

I, James L. Turner, do hereby certify that a copy of the foregoing Respondent's Answer to

Motion for Section 2255 Relief has been mailed on this the 2nd day of April, 2001, via certified

mail, return receipt requested to

     Mr. Ernesto Uribe-DeLeon
     Reg No. 82476-079
     3700 Wright Ave. (B.S.C.C.)
     Big Spring, Texas 79720-7701

               JAMES L. TURNER
               Assistant United States Attorney
               Federal Bar #: 1406
               State Bar #: 2031695
               910 Travis #1500
               Houston, Texas 77208
               (713) 567-9361